IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| TRANS-WESTERN PETROLEUM, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>WOLVERINE GAS AND OIL CORP., et al.,<br><br>Defendants. | MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT<br><br><br><br>Case No. 2:06-CV-801-TS |

This matter comes before the Court on cross Motions for Partial Summary Judgment.[1] The parties request that the Court render declaratory relief interpreting the provisions of the Armstrong Lease as they relate to the lessee's right to pool or unitize the lease. For the reasons discussed below, the Court will grant in part and deny in part both Motions.

I.  Background Facts

Plaintiff is Trans-Western Petroleum, Inc. ("Plaintiff"). Defendants are Wolverine Gas and Oil Corp. ("Wolverine"), United States Gypsum ("U.S. Gypsum"), Dale E. Armstrong ("Armstrong"), Chevron USA, Inc. ("Chevron"), Winn Exploration ("Winn"), and Billingsley

---

[1] Docket Nos. 31 and 35.

Interests ("Billingsley").

U.S. Gypsum is the owner of the oil and gas (the "OG Interest") underlying 1,720 acres of land ("Subject Lands") located in Sevier County, Utah. A lease ("Armstrong Lease") covering the OG Interest was granted by U.S. Gypsum to Armstrong on August 17, 1995 for a term of five years. The Armstrong Lease contained a unitization paragraph ("Paragraph 9"). On September 25, 2001, Armstrong assigned the Armstrong Lease to Chevron. By assignment dated August 2, 2002, but effective May 25, 2000, Chevron assigned the Armstrong Lease to Wolverine. Chevron reserved an overriding royalty interest. In August 2001, U.S. Gypsum and Wolverine extended the term of the lease to nine years with an end date of August 17, 2004. U.S. Gypsum then leased the property to Trans-Western on August 17, 2004 for five years.

On June 23, 2003, the Utah State Office of the United States Bureau of Land Management ("BLM") approved the designation of a portion of land in Sanpete and Sevier counties, including all of the Subject Lands, as logically subject to oil and gas exploration. These lands were designated as the "Wolverine Unit" (the "Unit"). Wolverine is the designated Operator of the Unit. A letter was mailed to certain "Leased Basic Royalty Owners," including U.S. Gypsum, on July 14, 2003, notifying them of the preliminary approval by the BLM. U.S. Gypsum did not respond to the letter. The BLM gave final approval of the Unit and governing Unit Agreement on July 28, 2003.

Sections 11 and 12 of the Unit Agreement set forth standards for the allocation of production upon a fractional basis to participating areas. There are currently ten wells producing within the Unit area but none of these wells has resulted in the inclusion of any of the Subject Lands within a participating area pursuant to the provisions of Section 11.

Trans-Western and Wolverine both claim to have a valid lease to the Subject Lands.

Trans-Western claims its lease with U.S. Gypsum is valid because the Armstrong Lease expired on August 17, 2004. Wolverine contends that the Armstrong Lease was properly extended by unitization.

II.     Procedural History

Trans-Western's Amended Complaint[2] asserts six causes of action: (1) declaratory judgment under 28 U.S.C. § 2201; (2) breach of contract; (3) breach of implied covenant of good faith and fair dealing; (4) negligent misrepresentation; (5) breach of covenant and quiet possession; and (6) breach of warranty of title. The first cause of action is against all defendants and Claims 2-6 are against U.S. Gypsum. The motions for partial summary judgment deal only with the first cause of action for declaratory judgment.

III.    Discussion

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.[3] The parties request a declaratory judgment under 28 U.S.C. § 2201, which reads, in part:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

Parties have submitted these motions on Stipulated Facts,[4] which the Court will rely on when deciding these motions.

---

[2]Docket No. 4.

[3]*See* Fed. R. Civ. P. 56(c).

[4]Docket No. 30.

As a preliminary matter, Defendants state that in this contract-based diversity action, the appropriate choice of law is Utah law and Plaintiff cites Utah law throughout its briefs. Therefore, the Court will apply Utah law in considering this motion.

A.  The Armstrong Lease

Paragraph 9 of the Armstrong Lease provides:

In connection with operations for the production of oil and gas or either of them, Lessee may at any time or times pool or unitize this lease insofar as it covers the lands covered hereby, in whole or in part, as to any stratum or strata, with other lands and leases in the same area or field so as to constitute a unit or units whenever, in Lessee's judgment, necessary or advisable to comply with a law, rule, order or regulation of a governmental authority having jurisdiction, to reduce or prevent economic waste, to protect correlative rights, or to promote, encourage or accomplish the conservation of natural resources, by filing for record an instrument so declaring subject to the following: (a) Units formed to establish or comply with an orderly or uniform well spacing pattern for the production of oil or gas shall allocate to the portion of this lease included in any such unit a fractional part of all production from any part of such unit in the proportion that the total number of acres covered by this lease included in such unit bears to the total number of acres included in such unit, and such units shall not exceed 80 acres if for the production of oil and shall not exceed 640 acres if for the production of gas, plus a tolerance of 10% in each instance, except that if the governmental authority having jurisdiction by appropriate rule, order or regulation prescribes or permits or, based on prior action of the applicable governmental authorities, may reasonably be expected to prescribe or permit units of a larger size, the unit or units may be increased to the maximum so prescribed or permitted or so reasonably expected to be prescribed or permitted; (b) Units formed to accomplish a cycling, pressure maintenance, repressuring or secondary recovery program, or any other cooperative or unit plan of development or operation involving multiple wells must be approved by the governmental authority having jurisdiction and **shall allocate to the portion of this lease included in any such unit a fractional part of production from any part of such unit** on one of the following bases: (i) the ratio between the quantity of recoverable production allocable to the portion of this lease included in such unit and the total of all recoverable production allocable to such unit; or (ii) such other basis as may be approved by the governmental authority having jurisdiction thereof.  Any such unit so established may be enlarged to include acreage believed to be productive or may be diminished by excluding acreage believed to be nonproductive or may be diminished by excluding acreage the owners of which fail or refuse to participate in the unit and, in the absence of current production therefrom, any such unit may be abolished and dissolved by filing for record an

4

instrument so declaring.  Instruments filed for record hereunder shall be filed in the public notice records of the county in which the land is situated.  Upon production from any part of any such unit, Lessor herein shall be entitled to the royalties provided for in this lease on only that fractional part of unit production allocated to that portion of this lease included in such unit.  Operations upon any such unit or projected to any part of any such unit from an off-unit drillsite or production from any part of such unit shall be treated and considered for all purposes of this lease, except payment of royalties, as operations upon or production from this lease.[5]

    1.    Allocation

Plaintiff's position is that Wolverine was not authorized to commit the lease to a unit unless all contractual requirements were satisfied.  Plaintiff argues that Wolverine's commitment to the Wolverine Unit did not satisfy the contractual requirement under Paragraph 9 of the Armstrong Lease, specifically, that a fractional part of production from any part of the Unit shall be allocated to the Armstrong Lease.  Thus, if any part of the Wolverine Unit produced unitized substances, the Armstrong Lease must share in that production for allocation and royalty purposes.  In support, Plaintiff's cite the language of Paragraph 9 that is in bold font above.

Defendants' position is that the plain language of the Armstrong Lease authorized Wolverine to commit the lease to the Unit.  Defendants further argue that as long as the sharing of production was approved by the appropriate government authority, even if the Armstrong Lease received no portion of production from the Unit, the Armstrong Lease was properly made a part of the Unit and the lease was extended by such inclusion.  At oral argument, Defendants' counsel cited *Vogel v. Tenneco Oil Co.*[6] in support of their position that the governmental authority approving the unitization could override the terms of the lease with respect to

---

[5]Cmplt. Ex. A (emphasis added).

[6]465 F.2d 563 (D.C. Cir. 1972).

allocation. The *Vogel* court found that the lease allowed unitization without complying with the lease if a governmental body permitted it.

The Court finds that the Armstrong Lease required any unit agreement to which it was committed must provide that some percentage of production, more than zero, be allocated to the Armstrong Lease in order for unitization to succeed. With respect to the *Vogel* case, that lease is structured differently than the Armstrong Lease. Paragraph 5 of the Vogel lease states that "[u]nitized tracts may not exceed 40 acres for oil and 160 acres for gas . . . except when any governmental authority prescribes or permits a larger unit."[7] The Armstrong Lease is not so broad. The BLM could set up a basis for allocation when a unit was formed, but was required by the lease to allocate *something* to the Armstrong Lease upon production from anywhere in the unit. There was no broad grant of power to the BLM allowing it to override the terms of the Armstrong Lease. Thus, because the Armstrong Lease required that it be allocated a fractional share of production from any part of the unit, and the Unit Agreement does not require such, and the fact is that the Armstrong Lease has never shared in the production of the Unit, the Armstrong Lease should not have been committed to the Unit and it expired by its terms in August 2004.

        2.        Exploration vs. Production

Plaintiff asserts that the Armstrong Lease does not authorize commitment to the Wolverine Unit for exploratory purposes. Plaintiff concedes that the lease does allow for unitization for production if all lease conditions are met. Defendant asserts that language of the unitization clause contemplates and includes exploratory wildcat drilling, as well as production.

---

[7] *Id*. at 565.

"An oil lease primarily contemplates production and a royalty consideration. Consequently we have held that there is implied under the terms of such lease an obligation on the part of the lessee to use reasonable diligence to develop the demised premises so long as the enterprise could be carried on at a profit."[8]  The Fifth Circuit also recognized that "[t]he word 'develop,' as used in the industry, clearly contemplates exploration."[9]

Much of the case law centers on a lessee's failure to develop a tract of land.  In this case, the tract of land was developed by wildcat drilling techniques which the Plaintiff asserts were not anticipated by the Armstrong Lease.  Several portions of the lease indicate that unitization for the purpose of exploration was anticipated.  Paragraph 5 defines "operations" as follows:

> drilling, digging and boring operations, producing operations, the drilling of a dry hole or successive holes before and after production is obtained, plugging back, reworking operations, deepening operations and remedial operations in connection with either drilling, or producing operations.

Paragraph 9 states that "[i]n connection with **operations** for the production of oil and gas, or either of them, the Lessee may at any time pool or unitize this lease" "**whenever**, in Lessee's judgment, necessary" to comply with governmental regulation, "to reduce or prevent economic waste."  Further, Paragraph 9 also provides for royalty payments "[u]pon production," which implies future production, not only current production.  Thus, the Court finds that exploration was anticipated by the lease and this independent ground for invalidating the unitization fails.

IV.     Conclusion

Based on the undisputed facts, the Court finds that Plaintiff Trans-Western is entitled to judgment as a matter of law that the lease expired by its terms.  The Court also finds that

---

[8] *Elliott v. Pure Oil Co.*, 139 N.E.2d 295 (Ill. 1956).

[9] *Gorenflo v. Texaco*, 735 F.2d 835, 838 (5th Cir. 1984).

Defendants are entitled to judgment as a matter of law that exploratory drilling was anticipated by the Armstrong Lease. It is therefore

ORDERED that Defendants' Motion for Partial Summary Judgment (Docket No. 31) is DENIED IN PART and GRANTED IN PART. It is further

ORDERED that Plaintiff's Motion for Partial Summary Judgment (Docket No. 35) is DENIED IN PART and GRANTED IN PART.

DATED December 3, 2007.

BY THE COURT:

_____
TED STEWART
United States District Judge